IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JERMAINE ADREAL STALLWORTH,
  Plaintiff,

vs.          Case No.: 3:17cv81/LAC/EMT

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,
  Defendant.
_____/

## REPORT AND RECOMMENDATION

This case was referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.

## I.    PROCEDURAL HISTORY

On May 28, 2013, Plaintiff filed an application for SSI, and in the application he alleged disability beginning December 31, 2008 (tr. 19).[1]  His application was denied initially and on reconsideration, and thereafter Plaintiff requested a hearing before an administrative law judge ("ALJ").  A hearing was held on November 3, 2015, and on November 25, 2015, the ALJ issued a decision in which he found Plaintiff "Not Disabled," as defined under the Act, at any time through the date of his decision (tr. 19–26).  On December 30, 2016, the Appeals Council denied Plaintiff's request for review (tr. 1).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

## II.    FINDINGS OF THE ALJ

In his written decision of November 25, 2015, the ALJ made several findings relative to the issues raised in this appeal (tr. 19–26):

1)    Plaintiff has not engaged in substantial gainful activity since May 28, 2013, the date he applied for SSI;

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on April 14, 2017 (ECF No. 5).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that appear.

2)    Plaintiff had the following severe impairments during the relevant period: lumbar spine degenerative disc disease and obesity[2];

3)    Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4)    Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b), with certain restrictions[3];

5)    Plaintiff was unable to perform any past relevant work;

6)    Plaintiff was born on March 8, 1974, and was 39 years old and thus a "younger individual" (i.e., one aged between 18 and 49) on the date he applied for SSI;

---

[2] The relevant period in this case is from approximately May 28, 2013 (application date) through November 25, 2015 (decision date), even though Plaintiff alleges disability commencing years earlier, in December of 2008. *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which he is both disabled and has an SSI application on file).

[3] Light work is defined in Section 416.967 as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b). The ALJ also added the following restrictions to the RFC for light work: (1) Plaintiff can climb stairs and ramps frequently, but not constantly; (2) he can never climb ladders, ropes, or scaffolds; and (3) he can kneel frequently, but can stoop, crouch, and crawl only occasionally (tr. 22).

7)      Plaintiff has a limited education and is able to communicate in English;

8)      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not he has transferable job skills;

9)      Considering Plaintiff's age, education, work experience, and RFC, there were jobs that Plaintiff could have performed that existed in significant numbers in the national economy;

10)     Plaintiff was not under a disability, as defined in the Act, between the date of his application for SSI, May 28, 2013, and the date of the ALJ's decision, November 25, 2015.

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd.,

921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify

as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 416.920(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, he is not disabled.

2.     If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 416.912. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     SUMMARY OF RELEVANT EVIDENCE

A.      Plaintiff's Statements and Testimony

On July 1, 2013, Plaintiff was interviewed in connection with his claim for SSI. He advised the interviewer that he could walk a block, could care for his own "grooming," could drive, could perform "light household chores unassisted," could lift a gallon of milk, that he shopped, and that he was able to cook a simple meal (tr. 171). Plaintiff made similar reports in an interview conducted on September 18, 2013,

although he additionally advised that he was able to bathe and dress without assistance (tr. 59).

At Plaintiff's hearing, held November 3, 2015, Plaintiff testified that he was forty-one years of age and had completed the eleventh grade (tr. 36). He noted that he was 5'7" and weighed 270 pounds (tr. 37). Plaintiff stated he previously worked as a delivery driver but stopped working in or about 2012 due to constant back pain (tr. 38, 45).[4] When asked why he was presently unable to work, Plaintiff stated that he cannot "be seated that long," his legs give out unexpectedly, and he can "hardly lift" with his right (dominant) arm (tr. 39, 37). He explained that the issue with his legs began "over a year ago" when he "first fell" (tr. 39).

Plaintiff then testified that the "worst pain in [his] body" was his back pain and that it occurred on a daily basis (tr. 40). He rated his pain at a ten (the worst) on a ten-point scale when he does not take his medication and at "about a six" with medication (*id.*). With respect to personal grooming and various daily activities, Plaintiff indicated he could feed himself, but he could not put on socks, he occasionally struggled with putting on pants and underwear, and he could not wash his own hair

---

[4] Plaintiff appears to have been mistaken about when he last worked, as his lawyer intimated at the hearing by pointing out that Plaintiff's earnings records reflect no income after 2008 (*see* tr. 45, 144–46).

(tr. 42, 44).  He testified that he did not shop for groceries or cook (tr. 42).  Plaintiff estimated that he could stand for five to ten minutes before having to sit, sit for fifteen to twenty minutes before having to stand, and walk no more than about a block (*see* tr. 43).  He stated that he could push open a door but that getting something off the floor would be difficult and take him "a minute" (tr. 44).

Finally, although a vocational expert was present at Plaintiff's hearing and was sworn in by the ALJ (*see* tr. 33–35), he did not testify.

B.    Medical Evidence

On October 31, 2012, Plaintiff presented to the St. Joseph Medical Clinic with reports of a "knot" in his back and right-sided hip and leg pain (tr. 211).  The handwritten notes are difficult to decipher but apparently depict some spasm in the back and/or "distress" in the area of L4-L5 (*see* tr. 212).  Dr. William Hooper recommended bed rest and prescribed a Medrol Dosepack (tr. 212).

On March 19, 2013, Plaintiff went to the emergency room ("ER") at Baptist Hospital and reported that he had "stepped in a hole," twisted, and fallen (tr. 219).  He complained of back pain (rating it at 10, on a 10-point scale) with difficulty sitting or standing (tr. 217–18).  An x-ray of the lumbar spine was obtained, which showed intact pedicles, no acute fracture or subluxation, and that vertebral body height and

alignment were maintained (tr. 224). No MRI was obtained. Medication was provided to Plaintiff, after which he was discharged with diagnoses of obesity and low back pain (tr. 217–19).

Within about a week of his visit to the ER, Plaintiff presented to the Escambia Community Clinic ("ECC") on March 25, 2013, to establish care. Plaintiff advised Physicians Assistant ("PA") Donald Hess that about one week prior he was carrying a television and stepped into a two-foot hole (tr. 246). He complained of low back pain that radiated into his buttock, leg, knee, and foot, as well as numbness and tingling in his foot (*id*.). A physical examination was normal except for right-sided straight leg raising, which was positive (*see id*.). PA Hess was concerned about a possible disc issue and felt it important that Plaintiff undergo an MRI (tr. 246). Plaintiff was provided with prescriptions for ibuprofen, Flexeril, and, for "breakthrough pain," Lortab (*id*.).

At Plaintiff's next ECC visit, on April 18, 2013, ARNP Jennifer Spencer noted that Plaintiff was "doing well on current meds" (tr. 244). A physical examination was unremarkable, other than in the spine where some spasm, tenderness, and pain with movement were noted (*see* tr. 244–45). ARNP Spencer discovered that Plaintiff had

missed his scheduled lumbar MRI because evidently no one was at home when the scheduler called his house (*see* tr. 244).

On May 14, 2013, an MRI of the lumbar spine was obtained (tr. 248). The MRI revealed "Broad-based disc protrusion L5-S1 with annular tear. Disc material abuts the medial aspects of the traversing S1 roots. Right greater than left." (*id.*).

ECC records dated May 15 and May 22, 2013, reflect that ECC clinicians wished to and/or tried to refer Plaintiff to a neurosurgeon (*see* tr. 243, 242), though the record shows that Plaintiff was never seen by a neurosurgeon.

On May 26, 2013, Plaintiff went to the ER at Sacred Heart Hospital (tr. 228). He stated he had been lifting a mattress when he felt a sudden, sharp pain in his back that radiated down to his right leg (*id.*). He rated his pain at a nine, and he appeared to be in "moderate pain distress" (tr. 229–30). Other than Plaintiff's back, a physical examination yielded normal results in all areas tested, to include range of motion testing in the upper and lower extremities (tr. 230). Babinski's tests were negative, and Plaintiff's gait was normal (*id.*). With respect to Plaintiff's back, the ER record states the following: "Back examination included findings of normal inspection, range of motion normal, Tenderness, midline to the lower back [and] paraspinal to the lower back, no costovertebral angle tenderness, no Scoliosis, [and] no pain with straight leg

raise" (*id.*).  Lumbar spine x-rays were obtained and revealed no abnormalities (tr. 230, 235).  Plaintiff was assessed with low back pain and muscle spasm and was discharged (tr. 230).

Plaintiff  returned to the ECC on May 28, 2013, with a complaint of back pain (tr. 241).  The record is somewhat sparse.  It was noted that Plaintiff was still waiting on his "WE Care" application, which evidently would allow him to see a neurosurgeon, and that the staff at the ECC would continue to "help with his pain" in the interim (*id.*).  Plaintiff was prescribed Lortab for breakthrough pain (*id.*).

On June 20, 2013, Plaintiff returned to the ECC and reported back pain but no joint or muscle pain (tr. 239).  He requested a note informing the child support office that he is unable to work (*id.*).  The treatment record states, "MRI results show L5-S1 disc protrusion with annular tear.  Neurosurgery referral is pending." (*id.*).  PA Roxanna Benton noted that Plaintiff was in no acute distress and that his posture and gait were normal (*id.*).  She did observe some localized swelling on the back, and she noted that back movements were painful and range of motion in the back was decreased (tr. 240).  She provided a note to Plaintiff stating that he should "take time off of work temporarily until his back pain is addressed" (*id.*).

Eight days later, on June 28, 2013, Plaintiff returned to the ECC (tr. 260). He reported neck pain for three days, as well as back pain (*id*.). His gait was normal (*id*.). He was prescribed medications and advised to return for x-rays if the neck condition did not improve (it did improve (*see, e.g.*, tr. 252), and the record contains no evidence of a neck x-ray).

Plaintiff returned to the ECC on July 23, 2013 (tr. 257). He complained of "a lot" of back pain and stated that the pain runs down into his lower extremities, with more pain on the right side (*id*.). ARNP Vicki Merold conducted a physical examination and noted, in pertinent part, that Plaintiff had difficulty lying on the exam table, had to "sidely" to get up, and exhibited radicular pain with leg lift at about thirty (30) degrees, with more pain on the right than the left (tr. 258). Plaintiff was advised to lose weight and encouraged to swim to promote weight loss (tr. 259). His Lortab was renewed (*id*.).

Plaintiff was next seen at the ECC on September 12, 2013 (tr. 252). His gait was normal, he was continued on medications, and it was noted that he had not yet seen a neurosurgeon (tr. 252–53, 254).

Plaintiff presented to the ER at Sacred Heart Hospital on November 21, 2013 (tr. 288). He stated that his right leg had given out while he was going down stairs,

and he fell on his right side and "fell down six stairs" (tr. 288–89). He stated that since the fall he had constant back pain, leg pain, and right-sided shoulder pain that radiated to his neck and caused the fingers on his right hand to tingle (tr. 288). He also stated that "nothing ma[de] the pain better" (*id.*). An examination revealed the following: normal upper and lower extremities, with normal ranges of motion; a normal gait; and normal range of motion in the neck, but some "very slight" swelling on the left and some "localized tenderness, very slight in duration" (tr. 290).[5] Plaintiff was discharged and advised to report to the ECC in two days for a recheck of his neck (*id.*).

When Plaintiff presented to the ECC approximately three weeks later, on December 11, 2013, he noted that his neck pain and symptoms had improved, though he reported "problems with his arms" (tr. 277). He also reported back pain (*id.*). ARNP Merold acknowledged Plaintiff's back pain, but she went on to state that his back pain was "pretty well controlled with [his medication] regimen" (tr. 278).

Return visits to the ECC on April 11 and July 11, 2014, reflect no new developments as to Plaintiff's back, and that he was continued on prescription

---

[5] Though the ER treatment record is partially illegible, it appears to document a Staphylococcus infection, along with advice to Plaintiff to take doxycycline (an antibiotic) twice a day for the "soft tissue infection on [his] neck" (*see* tr. 290). It is thus unclear whether the slight abnormalities noted during the neck examination were attributable to Plaintiff's fall or to the Staph infection.

medications (tr. 270–72, 267–69).  At the July visit a cervical MRI was ordered, evidently due to Plaintiff's complaints of pain and numbness in the right upper extremity (*see* tr. 269).  The treatment record contains an addendum noting that Plaintiff failed to show for the scheduled MRI (tr. 269).

The next ECC treatment record is dated October 13, 2014 (tr. 308).  Plaintiff again reported back pain (*id.*).  ARNP Merold noted that during this visit Plaintiff had difficulty getting onto and off the exam table and sat on his left hip due to pain (tr. 309).  The remaining treatment records from the ECC include one from December of 2014 and five from 2015, in the months of January, March, April, June, and August (*see, e.g.*, tr. 344, 341, 337, 333, 329, 326).  These records are largely consistent with the prior ECC records, as they show that Plaintiff continued to complain of back pain at each visit, and that ECC clinicians continued to prescribe a variety of medications to treat the pain (*see, e.g.*, tr. 342).

C.      Opinions of Non-Treating Sources

On September 20, 2013, Cristina Rodriguez, M.D., reviewed the medical evidence of record, including the lumbar MRI results (*see* tr. 56), and she opined that Plaintiff was capable of performing the full range of work at the light exertional level and had no postural or manipulative limitations (tr. 62–63).  Then, relying on Medical-

Vocational Rule 202.17, she cited three occupations that a person of Plaintiff's age, education, and RFC could perform, namely, a paper cutter, key cutter, and carbonation tester (tr. 64).

At the behest of the Social Security Administration, Plaintiff was examined by John A. Dawson, M.D., on March 5, 2015. Plaintiff advised Dr. Dawson that he had "severe low back pain" that is "often so great in the morning that he is unable to get out of the bed for several hours" (tr. 311). He stated that the pain abates once he gets out of bed and is able to walk around for a while but that it worsens with extended sitting or walking, and his right leg will give out while walking (*id*.). While Dr. Dawson noted he had reviewed a medical record that indicated degenerative disc disease ("DDD") and a disc protrusion, he did not have a copy of the MRI, making it unclear which medical record he had reviewed (*id*.).

Dr. Dawson's physical examination yielded the following:

I-XII intact. CLR and DLR are present. DTRs are 2+ throughout. He passed the Romberg test. He can tandem walk. He did stumble on occasion while attempting to tandem walk for greater than four feet or so. He showed no change to pain, touch, proprioception or vibration all four limbs [sic]. Gait was nonantalgic. He was unable to fully hop but he was able to briefly heel and toe walk on either leg. Strength was 5/5 bilateral lower extremities, 5/5 bilateral upper extremities without atrophy.

\* \* \*

He was able to pick up a pen, use a pen, turn a doorknob, button and unbutton clothes.  Bilateral grip was 5/5 measured with ergometer.  He showed full ROM of fingers, wrists, elbows and shoulders without evidence of arthritis, bursitis or tendinitis.

* * *

He was able to transfer in and out of the chair and on and off the table without assistance.  He did exhibit pain behavior in reclining into the supine position.  Visually CTLS spine showed no gross abnormality.  On palpation there was tenderness from L2 to L5 bilaterally in the paravertebrals.  I could not elicit specific spasm above this level but within this level there were occasional trigger areas where there was spasm.  He showed full ROM of cervical spine passively.  Lumbar spine showed decreased ROM.  See chart [6] . . . .  He shows full ROM of hips, knees, ankles, feet and toes without evidence of arthritis, bursitis or tendinitis.  He was able to dress and undress without assistance.

(tr. 312).

Dr. Dawson assessed morbid obesity and lumbar spine DDD with right lower extremity radiculopathy (tr. 313).  He then opined that Plaintiff could lift or carry up to ten pounds continuously, eleven to twenty pounds frequently, and twenty-one to fifty pounds occasionally, and that he could never lift more than fifty pounds (tr. 317).  He also concluded that Plaintiff could sit for an hour at a time, for a total of four hours in an eight-hour day, and stand or walk in thirty-minute increments, for a total of two hours a day as to each activity (tr. 318).  He assessed no limitations with respect to

---

[6] The chart to which Dr. Dawson referred is a "Range of Motion Report Form," which shows full range of motion in all areas tested except the lumbar spine (tr. 314–16).

Plaintiff's ability to use his hands, to balance, or to perform daily activities (tr. 319–20, 322).  With respect to Plaintiff's feet, Dr. Dawson concluded that Plaintiff could operate foot controls frequently with his right foot and continuously with his left foot (tr. 319).  He totally restricted Plaintiff from climbing ladders or scaffolds but opined that Plaintiff could frequently kneel and climb stairs and ramps, and occasionally stoop, crouch, or crawl (tr. 320).  Dr. Dawson concluded his opinions by stating, "prolonged sit stand walk [sic] will be difficult for [claimant], [he] will need sit/stand alternating breaks to reach" the sitting, standing, and walking limits he previously assessed (tr. 322).

## V.     DISCUSSION

Plaintiff raises three issues in this appeal, which the undersigned has rearranged for organizational purposes.  First, Plaintiff claims the ALJ erred in discounting the opinions of Dr. Dawson and crediting those of Dr. Rodriguez.  Second, Plaintiff contends the ALJ erred by relying exclusively on the Medical-Vocational Guidelines to find that he was not disabled.  Last, Plaintiff argues that the ALJ erred in discounting his complaints of pain.

### A.     Opinions of Dr. Dawson and Dr. Rodriguez

Weighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of the process for determining disability. An ALJ may reject any medical opinion if the evidence supports a contrary finding. <u>Sryock v. Heckler</u>, 764 F.2d 834, 835 (11th Cir. 1985). Nonetheless, the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor, and the failure to do so is reversible error. <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 279 (11th Cir. 1987); *see also* <u>Hudson v. Heckler</u>, 755 F.2d 781, 786 (11th Cir. 1985) (without the ALJ stating the specific weight given to different medical opinions and the reasons therefor, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence). Absent good cause, the opinions of treating physicians must be accorded substantial or considerable weight. <u>Lamb v. Bowen</u>, 847 F.2d 698, 703 (11th Cir. 1988).

While the opinion of a one-time examining physician may not be entitled to deference, especially when it contradicts the opinion of a treating physician, the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician. <u>Broughton v. Heckler</u>, 776 F.2d 960, 962 (11th Cir. 1985). Moreover, the opinions or findings of a non-examining physician are entitled to little weight when they contradict the opinions or findings of a treating

or examining physician, and standing alone they do not constitute substantial evidence.  Lamb, 847 F.2d at 703; Sharfarz, 825 F.2d at 279.

In this case, the ALJ discussed Dr. Dawson's opinions and then gave "little weight" to his opinions regarding sitting, standing, and walking; the need to alternate between sitting and standing; and the operation of foot controls (tr. 24).  The ALJ did so because those opinions "appear to reflect and address [Plaintiff's] subjective complaints"; because "the medical evidence of records fails to establish a sufficient objective basis for such limitations"; and because "nowhere in the record has [Plaintiff] been observed to walk with an antalgic gait" (id.).  The ALJ also found that Plaintiff's "normal lower extremity motor strength and sensation, as well as his ability to transfer to and from his chair and the examination table without assistance and to walk at least briefly on his heels and on his toes, suggest that Dr. Dawson may have overstated [Plaintiff's] standing and walking limitations" (id.).  Continuing, the ALJ stated that "the evidence as a whole fails to establish that [Plaintiff] would require a special option to alternate between sitting and standing"; that Plaintiff "told his primary care practitioners that his medications relieve his back pain 'pretty well,' and he seems rarely, if ever, to have complained to them about any substantial limitations in his ability to sit, stand, or walk, except perhaps in the immediate aftermath of

injuries"; that Plaintiff does not need a cane; and that Plaintiff reported a "fairly normal range of daily activities" (*id*.).  The ALJ additionally noted that Dr. Dawson's opinions conflicted with those of Dr. Rodriguez (*id*.).

The ALJ went on to reject Dr. Dawson's lifting and carrying assessments—albeit in a manner favorable to Plaintiff—because he found them inconsistent both with Dr. Dawson's opinion that Plaintiff could stoop only occasionally and with the findings of Plaintiff's 2013 lumbar MRI (tr. 24).  The only opinions of Dr. Dawson to which the ALJ assigned "great weight" were those relating to Plaintiff's ability to perform postural activities (i.e., climb, balance, stoop, kneel, crouch, and crawl) (*id*.).  The ALJ noted that when the postural restrictions assessed by Dr. Dawson were combined with the exertional limitations inherent in the RFC for light work, they "adequately address the functional deficits imposed by [Plaintiff's] back pain and obesity" (*id*.).  Last, the ALJ adopted the opinions of Dr. Rodriguez, all of which correlated with a finding that Plaintiff was able to perform the full range of light work, and he added to those opinions the postural limitations assessed by Dr. Dawson (*see* tr. 24–25).

Although the ALJ stated the specific weight he gave to Dr. Dawson's various opinions and the reasons therefor, the undersigned cannot confidently conclude that

the reasons—taken as a whole—are substantially supported by the record. To be sure, *some* of the reasons are supported by the record, but others are not, and it is unclear whether the reasons that are supported are sufficient to uphold the ALJ's findings.

Initially, the undersigned discerns nothing from Dr. Dawson's report indicating that he based his opinions to any extent on Plaintiff's subjective complaints of pain. He obviously recorded those complaints in his report, as is customary, but he went on to conduct a thorough physical examination that revealed abnormalities of the lumbar spine, after which he rendered opinions as to Plaintiff's functional capacities. Dr. Dawson *could have* taken Plaintiff's subjective complaints into account, but it is equally likely that he was influenced—or primarily influenced—by his personal observations when physically examining Plaintiff. Because nothing in his report establishes one scenario over the other, the reasoning of the ALJ is unsupported by the record.

While it is true that on December 11, 2013, ARNP Merold commented that Plaintiff's medication controlled his pain "pretty well," as the ALJ pointed out, this isolated comment is less probative than the other, more voluminous evidence of record suggesting that Plaintiff's pain was only marginally controlled by medicine. Such evidence includes Plaintiff's regular course of treatment during the relevant period and

frequent adjustments to his medication regimen, the oft-repeated recommendation for a neurological referral by Plaintiff's treating providers (i.e., ECC staff), which evidently Plaintiff could not afford and thus did not obtain, as well as Plaintiff's consistent and repeated reports of back pain—and usually severe back pain at that (the undersigned has not located a single treatment record that does not reflect a complaint of back pain, even with medication, though Plaintiff did report resolution of his *neck* pain).

The ALJ also found that the medical evidence of record fails to establish a sufficient objective basis for the sitting, standing, and walking limitations set forth by Dr. Dawson, as well as the requirement that Plaintiff alternate between sitting and standing. But there *is* objective evidence in the record that certainly could be viewed as being consistent with those limitations and the need for a sit/stand option—namely, the findings of the lumbar MRI. What is more, the MRI shows that Plaintiff's condition was actually worse than what Dr. Dawson appeared to believe. The lumbar MRI showed a broad-based disc protrusion *with an annular tear*, as well as disc material that was not only protruding but was also *abutting certain aspects of the traversing S1 roots*, but Dr. Dawson stated the MRI showed only DDD and a disc protrusion. It was within the ALJ's realm of judging to disagree with the limitations

assessed by Dr. Dawson and/or the extent of those limitations. But in order to properly reject them, the ALJ was required to provide concrete and well-supported reasons for assessing no sit/stand option whatsoever and for substantially exceeding the other limits set by Dr. Dawson as to the total length of time and increments in which Plaintiff could sit, stand, or walk.

Last, an additional reason cited by the ALJ—that Dr. Dawson's opinions conflicted with those of Dr. Rodriguez—would normally be a reason to assign little weight to *Dr. Rodriguez's* opinions, not those of Dr. Dawson, since Dr. Rodriguez did not examine Plaintiff. *See* <u>Lamb</u>, 847 F.2d at 703; <u>Sharfarz</u>, 825 F.2d at 279. Moreover, Dr. Rodriguez's opinion was rendered in September of 2013, early in the relevant period, while Dr. Dawson's was rendered in May of 2015, much closer to the end of the relevant period. Thus, Dr. Rodriguez could not have considered any of the many medical records from the relevant period that post-date her opinion, yet the ALJ adopted her opinions over those of Dr. Dawson.[7]

---

[7] The ALJ adopted Dr. Rodriguez's opinions in whole in determining that Plaintiff had the ability to perform the full range of light work; to this he added *only* the postural limitations assessed by Dr. Dawson. However, as explained below, because postural limitations are considered non-exertional impairments that generally do not erode the base of available light or sedentary jobs, the addition of these postural restrictions to Plaintiff's RFC does not alter the opinions of Dr. Rodriguez in any material respect (as it relates to the claims in this appeal); nor does it demonstrate that the ALJ gave proper weight to Dr. Dawson's *other* opinions.

Based on the foregoing, the undersigned concludes that the ALJ's reasons for rejecting Dr. Dawson's opinions are not supported by substantial evidence on the record as a whole.  Correspondingly, the ALJ's related RFC determination is also unsupported by the record.

B.      Medical-Vocational Guidelines[8]

There are two avenues by which an ALJ may determine whether a claimant has the ability to adjust to other work in the national economy.  The first is by applying the Medical-Vocational Guidelines (also knows as "the grids"), found at 20 C.F.R. pt. 404 subpt. P, app. 2.  Phillips v. Barnhart, 357 F.3d 1232, 1239 (11th Cir. 2004).  The grids provide claimants with an alternate path to qualify for disability benefits when their impairments do not meet the requirements of the listed qualifying impairments. *Id*. "The grids provide for adjudicators to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience." *Id*.  Each of these factors can independently limit the number of jobs realistically available to an individual.  Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled."  *Id*.

---

[8] While the error with respect to Dr. Dawson (and the RFC) is enough to remand this case for further administrative proceedings, the undersigned will also address the ALJ's findings at Step 5, as the earlier error contributed to errors made at the final step, further demonstrating the need for a remand.  There is, however, no need to address Plaintiff's third claim as to his credibility.

The other means by which an ALJ may determine whether the claimant is able to adjust to other work in the national economy is by the use of a vocational expert ("VE"). *Id.* A VE is an expert on the kinds of jobs an individual can perform based on his capacity and impairments. When the ALJ uses a VE, the ALJ will pose hypothetical questions to the VE to establish whether someone with the limitations that the ALJ has previously determined that the claimant has will be able to secure employment in the national economy. *Id.*

The *general* rule is that after determining a claimant's RFC and ability or inability to return to past relevant work, the ALJ may use the grids to determine whether other jobs exist in the national economy that a claimant is able to perform. However, "[e]xclusive reliance on the grids is not appropriate *either* when [the] claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills." Francis v. Heckler, 749 F.2d 1562, 1566 (11th Cir. 1985) (emphasis added) (citing Broz v. Schweiker, 677 F.2d 1351, 1361 (11th Cir. 1982), *adhered to sub nom.* Broz v. Heckler, 711 F.2d 957 (11th Cir. 1983)); *see also* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Martin v. R.R. Ret. Bd., 935 F.2d 230, 234 (11th Cir. 1991); Walker, 826 F.2d at 996;

Sryock, 764 F.2d at 836.  Therefore, this court "must determine whether *either* of these two conditions exists in this case.  If *either* condition exists, the ALJ was required to consult a vocational expert."  Phillips, 357 F.3d at 1242.

Here, in exclusively relying upon the grids to find Plaintiff "Not Disabled," the ALJ considered: (1) Plaintiff's RFC; (2) that Plaintiff was a "younger individual"; (3) that Plaintiff had a limited education and could communicate in English; and (4) Plaintiff's past relevant work as a package deliverer (*see* tr. 25–26).  The combination of these factors under the grids led to the conclusion that Plaintiff was not disabled.

More specifically, the ALJ stated:

> In determining whether a successful adjustment to other work can be made, the undersigned [ALJ] must consider the claimant's [RFC], age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled," depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking, unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

> If the claimant had the [RFC] to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.18.  The additional [postural] limitations in [Plaintiff's RFC] have little or no effect on the occupational base of unskilled light work.  A finding of "not disabled" is therefore appropriate under the framework of this rule.  A limitation on ascending scaffolding, poles, or ropes has little or no effect on the unskilled light occupational base.  The same is true for limitations on kneeling and crawling.  Moreover, while the need for occasional stooping is implicit in light work's exertional demands, light work, unlike medium work, does not generally require frequent stooping.  (See SSR 83-14).

(tr. 26).

As discussed above, the ALJ's exclusive reliance on the grids here was in error *if* Plaintiff was unable to perform a full range of light work ("condition one") *or if* he had non-exertional impairments that significantly limited basic work skills ("condition two").

With respect to condition one, the ALJ found that Plaintiff met all of the seven primary strength/exertional requirements—i.e., those pertaining to standing, walking, sitting, lifting, carrying, pushing, and pulling—of light work, and thus could perform the full range of light work.  *See* 20 C.F.R. § 416.969a(a); SSR 84-14; *see also* Foote, 67 F.3d at 1559 (an "exertional impairment" for social security disability purposes is an impairment which places limits on an individual's ability to meet job strength requirements); Phillips, 357 F.3d at 1241 n.11 (noting the seven strength demands of

the job).  But as previously explained, the ALJ's RFC determination is flawed.  It is therefore unclear whether Plaintiff in fact was able to perform the full range of light work.  If he could not, condition one exists, such that reliance upon the grids was improper.  Given this uncertainty, the ALJ's decision cannot be affirmed.

Additionally, the record appears to show that condition two exists, given that Plaintiff had at least one non-exertional impairment—pain (and was morbidly obese, which likely worsened his pain)—that would have significantly limited basic work skills.  *See, e.g.*, Phillips, 357 F.3d at 1241 n.11 ("Nonexertional limitations or restrictions affect an individual's ability to meet the other demands of jobs and include mental limitations, pain limitations, and all physical limitations that are not included in the seven strength demands."); Watson v. Astrue, 376 F. App'x 953, 957 n.7 (11th Cir. 2010) (nonexertional limitations include pain, side effects from medications, colon discomfort, mental impairments, tolerating environmental working conditions, hearing or speaking, and the inability to walk without an assistive device).  Additionally, to the extent the ALJ erred by wholly rejecting Dr. Dawson's recommendation for any sort of a sit/stand option and by failing to include any such option in Plaintiff's RFC, condition two would also exist on this basis and thereby preclude exclusive reliance on the grids.  *See* Gibson v. Heckler, 762 F.2d 1516, 1521

(11th Cir. 1985) (per curiam) (holding that the grids should not have been applied where the ALJ found claimant could perform sedentary or light work with a sit/stand limitation because the RFC variable of the grids does not take into account a sit/stand limitation).

A VE was present at Plaintiff's hearing.  For reasons unknown the ALJ failed to solicit any testimony from him.  He should have.  It may very well be that light or sedentary jobs with sit/stand options were available to Plaintiff, or that jobs were available that otherwise would have accommodated some or all of the restrictions recommend by Dr. Dawson that were not set forth in the RFC but probably should have been.  This is precisely the sort of testimony the VE could have and should have provided.

In conclusion, the ALJ erred in weighing the opinions of Dr. Dawson and Dr. Rodriguez, erred in determining Plaintiff's RFC, and in all likelihood erred in relying exclusively on the grids to find Plaintiff "Not Disabled" at Step 5.  This case should therefore be remanded for further administrative proceedings where those errors can be corrected.

Accordingly, for all of the foregoing reasons, it is the opinion of the undersigned that the Commissioner's decision is not supported by substantial evidence and should not be affirmed.

It is therefore respectfully **RECOMMENDED**:

1.      That pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be **REVERSED**, and the Commissioner be ordered to remand this case to the Administrative Law Judge for further proceedings consistent with this Report and Recommendation.

2.      That **JUDGMENT** be entered, pursuant to sentence four of 42 U.S.C. § 405(g), **REVERSING** the Commissioner's decision and **REMANDING** this case for further administrative proceedings.

3.      That the Clerk be directed to close the file.

At Pensacola, Florida this 28th day of February 2018.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636**.